ROME IRON MILLS, INC., PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 8816.   Promulgated March 7, 1928.

*Frank R. Series, Esq., Don R. Almy, Esq.*, and *Charles H. Lawson, Esq.*, for the petitioner.

*John D. Foley, Esq.*, for the respondent.

1204

1206

OPINION.

Murdock: In its brief the petitioner states that the petitioner raised the point that the Commissioner has not made a proper allowance for invested capital because "the difference between surplus on January 1, 1911 ($234,011.44) and $115,000 capital stock issued and distributed as a stock dividend and by error not thereafter reflected on the books of the company, to wit: the sum of $119,011.44 was not allowed." We have set forth verbatim in our opening statement the allegations of error contained in the petition, and it is apparent that they do not raise any such point as is claimed in the brief. Neither are any facts alleged in the petition to support an error of this kind. The petition has never been amended. We are unable to tell from the deficiency notice or from the evidence whether or not the Commissioner has taken into account the amount of $119,011.44 in his computation of invested capital for the years before us so that the issue has not been properly raised, and even if it had been properly raised, we do not know what the Commissioner has done. Furthermore, the evidence does not show that $119,011.44 should be included in the petitioner's invested capital for the years in question. If the Rome Merchant Iron Mill had a real surplus of $119,011.44 which was erroneously wiped off its books, there might be merit in this contention of the petitioner, but there is nothing in the evidence to indicate that any real surplus was eliminated from the books. The resolutions which we have set out in our findings of fact indicate only that there was sufficient surplus to take care of the stock dividend and no more. Surplus in excess of this amount theretofore carried would seem to have been deliberately written off the books by the new owners of the company. If it were true, as the petitioner contends, that the Rome Merchant Iron Mill had a surplus of $119,011.44 after the declaration of its stock dividend of $115,000, then the 1,500 shares thereafter offered for sale would have had a value of about $134 each. Yet we know that this stock was offered for sale at par and even at par was not all sold until about a year had elapsed. We think that the weight of the evidence indicates that the Rome Merchant Iron Mill had no real surplus in excess of the $115,000 stock dividend which it declared and we know of no reason to make any change in the Commissioner's determination as to this item.

The first error assigned is that the petitioner's invested capital for each of the years 1918 and 1920, has been reduced by the Commissioner in the amount of $165,155.50, on the ground that the amount represents intangibles of no value. The Commissioner has never indicated or admitted that he made such a reduction and the petitioner has failed to prove that such a reduction was in fact made. The same can be said in regard to the other two errors alleged. So

far as we know the questions before us may be merely moot questions which we need not answer.

The petitioner claims that it had an asset of good will worth $165,-155.50, or, at least, $150,123.53, which the Commissioner eliminated from his calculation of the petitioner's invested capital. The petitioner further claims that it had two patents worth $150,284.96, which the Commissioner eliminated from his calculation of the petitioner's invested capital and on which he allowed no deduction for exhaustion. We have just pointed out that we do not know what the Commissioner did in regard to these two alleged assets, but were we to assume that he did what the petitioner claims he did, we can not say that his action was erroneous.

There is an allegation in the petition that the item called "Contracts, Good Will and Trade Names" in the amount of $165,155.50, represents good will only. This allegation was admitted in the answer. And yet on the books and statements of the petitioner this item was always called "Patents" and, in relation to this so-called patent asset, depreciation has been deducted by the petitioner on its financial statements, and deductions for depreciation have been claimed on its returns. Despite these deductions later statements still include $165,155.50 as the value of the asset. We are unable to reconcile the admitted allegation with the other evidence. It would seem that the petitioner has proven error in its own allegation and that the $165,155.50 item really represents, not good will but patents. If the item represents patents, the value of which became less each year, it is paradoxical to claim that the value remained the same year after year. The two items of good will and patents have been so confused that we are unable to understand what claims have been made in the returns as to each, what allowances have been made on those claims, and what should have been allowed.

The petitioner does not contend that the Commissioner should have allowed a greater amount in invested capital on account of cash or property paid in for stock or shares, but contends that the error occurred in the computation of earned surplus and undivided profits. Only parts of the Commissioner's computations of the petitioner's invested capital for 1918 and 1920 are before us. In each, an item appears identified as surplus shown by the revenue agent's report. This report is not before us and we do not know what the surplus as therein shown reflected. The petitioner admits being a corporation resulting from the reorganization of a predecessor in which the control of the business remained in the same persons and which, under section 331 of the Revenue Act of 1918, is entitled for invested capital purposes to no greater value of the assets transferred than the predecessor corporation would have been entitled to, but claims that the predecessor, if in existence during the taxable years, would

have been entitled to include in its invested capital an amount representing the value of its good will at the beginning of each year, and an amount representing the value of the patents at the time they were acquired. The argument of the petitioner is that the Revenue Act of 1917, in section 207, specifically recognized good will as earned surplus, but made an unjust proviso that the good will of a corporation could only be included in invested capital if it had been paid for in cash, tangible property, or shares; that the Revenue Act of 1918 rectified this injustice in section 326(a)(3) by using the words of section 207 of the 1917 Act to describe what may be included in invested capital, but omitting the proviso; that under the 1918 Act, earned good will constituted earned surplus, otherwise the words "earned surplus" would have no meaning in the Act, inasmuch as the words "undivided profits" take care of other earnings of a corporation.

If such were the intent of Congress, good will and other assets would have to be revalued each year. We do not agree that Congress so intended. The Supreme Court of the United States in *La Belle Iron Works* v. *United States*, 256 U. S. 377, held that under the 1917 Act, no annual revaluation of assets for invested capital was intended, and we think that the same reasoning applies to the 1918 Act, despite the fact that it does not contain the proviso mentioned. Good will of the Rome Merchant Iron Mill should not be reflected in its invested capital in an amount exceeding the cost of that good will. No satisfactory evidence of this cost was introduced. We can not conclude that the cost of advertising was the equivalent of the cost of good will. An unknown portion of the cost of advertising, which we are unable to segregate, may have been allocable to current expense. *Appeal of Northwestern Yeast Co.*, 5 B. T. A. 232. Likewise, the depreciated cost, or the unexhausted portion of the cost of patents might under some circumstances be reflected in invested capital, inasmuch as in the assets of the purchaser the patents take the place of the money which was paid for them. But in this case the purchaser of the patents was to pay for them on a royalty basis and the royalties to be paid would be ordinary and necessary expenses of the business for the year in which paid, and the patents purchased would not take the place of an asset represented by the money paid for them; because the part paid for had been exhausted during the year; so it is difficult to see how their cost could ever be reflected in invested capital.

The petitioner is entitled to a deduction for exhaustion of a portion of the cost to it of the rights to the inventions or to the patents. It happens in this case that the petitioner exchanged its stock for the assets of a predecessor corporation so that the cost to the petitioner of the assets acquired was the value of the assets acquired, since the

stock had the same value as the assets. Included among the assets acquired were the rights to the inventions or to the patents in question. To determine the cost of this particular asset we would have to know among other things its actual cash value at the time acquired by the petitioner. This value is not measured by the royalties to be paid, but is rather the value of the asset to the petitioner over and above the royalties to be paid by the petitioner. The evidence shows that no one knew what that value was and on the evidence before us we are unable to determine what it was. The patents were not granted until July 3, 1917, and the agreement provided that from that date a percentage was to be paid to the inventor, so we do not know any earnings prior to that date. The petitioner in later years derived profits as a result of the rights which it then acquired, but we are at a complete loss to say to what extent those profits reasonably could have been or were foreseen at the date the petitioner acquired the rights. The evidence would seem to indicate that for 1918 the petitioner claimed and was allowed exhaustion on these patents. For 1920 we can not tell what was allowed. For neither year can we say that the action of the Commissioner was erroneous.

*Judgment will be entered for the respondent.*